1  Rafey S. Balabanian (SBN 315962)
   rbalabanian@edelson.com
2  Todd Logan (SBN 305912)
   tlogan@edelson.com
3  Yaman Salahi (SBN 288752)
   ysalahi@edelson.com
4  EDELSON PC
   150 California Street, 18th Floor
5  San Francisco, California 94111
   Tel: 415.212.9300
6  Fax: 415.373.9435

7  *Counsel for Plaintiffs and the Proposed Class*

8  **UNITED STATES DISTRICT COURT**

9  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10  **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 11  SARA MEDINA and ALICIA MARTINEZ, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-02540-TLT |
| 13  *Plaintiffs,* | **SECOND AMENDED CLASS ACTION COMPLAINT FOR:** |
| 14  *v.* | |
| 15  TWO JINN, INC., a California corporation, d/b/a ALADDIN BAIL BONDS, and ADLER WALLACH & ASSOCIATES, INC., a California corporation, d/b/a AWA COLLECTIONS, | **(1) VIOLATION OF THE UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200,** *et seq.* |
| 18  *Defendants.* | **(2) VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, CAL. CIV. CODE §§ 1788,** *et seq.* |
| | **(3) VIOLATION OF THE CALIFORNIA CREDIT REPORTING AGENCIES ACT, CAL. CIV. CODE §§ 1785.1,** *et seq.* |
| | **(4) DECLARATORY RELIEF** |
| | **DEMAND FOR JURY TRIAL** |

26      Plaintiffs Sara Medina and Alicia Martinez, individually and on behalf of a proposed

27  class, bring this Second Amended Class Action Complaint and Demand for Jury Trial against

28  Defendants Two Jinn, Inc., d/b/a Aladdin Bail Bonds, and Adler Wallach & Associates, Inc.,

d/b/a AWA Collections, seeking monetary restitution, actual damages, statutory damages, punitive damages, an injunction, declaratory relief, and other appropriate relief from Aladdin's invalid, unlawful, and unenforceable credit bail agreements. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief.

## PARTIES

1.     Plaintiff Sara Medina is a natural person and a citizen of the State of California. She resides in Napa, California.

2.     Plaintiff Alicia Martinez is a natural person and a citizen of the State of California. She resides in San Jose, California.

3.     Defendant Two Jinn, Inc. is incorporated in the State of California. Its principal place of business is in Carlsbad, California. It regularly transacts business throughout the State, including in this District. It commonly uses the business alias Aladdin Bail Bonds. It operates as a bail bond agent in California.

4.     Defendant Adler Wallach & Associates, Inc. is incorporated in the State of California. Its principal place of business is in Orange, California. It regularly transacts business throughout the State, including in this District. It commonly uses the business alias AWA Collections. It operates as a debt collector in California, including on behalf of Aladdin Bail Bonds.

## JURISDICTION AND VENUE

5.     Defendant Aladdin Bail Bonds removed this matter from Napa Superior Court to this Court pursuant to 28 U.S.C. § 1453(b). *See* Dkt. 1 ¶ 6. Aladdin alleged that this Court had original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), including because at least one member of the proposed Class is a citizen of a state other than California. *Id.* ¶ 17. Plaintiffs do not dispute that factual assertion.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 84(a) and § 1441(a).

**GENERAL ALLEGATIONS**

**I.     How Cash Bail Works in California**

7.     When a person in California is arrested and accused of a crime, the court must decide whether to permit their release from detention pending trial.  When release is appropriate, it is usually accomplished through cash bail.  The court sets a bail amount which, if posted, entitles the individual to release, on the condition that they return to court for proceedings.  If the individual returns for proceedings as required, then the posted bail amount is returned to them when proceedings are completed.  If they fail to do so, they forfeit the posted bail.

8.     Bail amounts set by courts in California are routinely set beyond the financial means of the vast majority of people who face charges.  In March 2021, the California Supreme Court ruled that it violated the state constitution to "condition[] freedom solely on whether an arrestee can afford bail."  *In re Humphrey*, 11 Cal. 5th 135, 143 (2021).  The court cited a report finding that "[t]he median bail amount in California ($50,000) is *more than five times* the median amount in the rest of the nation (less than $10,000)."  *Id.* at 148 (emphasis in original).  Because of the high cost, most people have no choice but to work with commercial bail bond companies if they want to be released from jail pending trial.

9.     Bail bond companies post bail with the court in exchange for the payment of a non-refundable "premium."  The premium is commonly calculated as 10% of the total bail amount.  Surety companies underwrite these bail bonds, and bail bond agents coordinate the transactions with the accused, the sureties, and the courts.  For example, if a court sets bail at $100,000, a surety working with a bail agent will underwrite the full bail amount with the court in exchange for a $10,000 (10%) non-refundable premium payment to the bail agent.

10.     Most people caught in these circumstances do not have the ability to pay $10,000 out of pocket, however.  By way of example, according to the Federal Reserve, in 2019, half of American families had less than $5,300 in cash savings.

11.     To secure sales, then, many bail bond agents—including Aladdin—agree to accept payment of the required premium through a credit transaction.  Take the hypothetical $10,000 premium on the $100,000 bail discussed above.  In this scenario, the bail bond company

1   might agree to post bail in exchange for an agreement to make the full payment over time,

2   including a smaller "down" payment (such as $1,000) at the outset and the $9,000 becoming a

3   debt to be paid off later.

4       12.     In other words, the bail bond agent finances the bail bond premium through a

5   credit agreement.

6       13.     Such credit arrangements constitute consumer credit contracts subject to the

7   requirements of California Civil Code §§ 1799.90, *et seq.*  California Civil Code § 1799.91

8   requires that, "[u]nless the persons are married to each other, each creditor who obtains the

9   signature of more than one person on a consumer credit contract shall deliver to each person who

10  does not in fact receive any of the money, property, or services which are the subject matter of

11  the consumer credit contract, prior to that person's becoming obligated on the consumer credit

12  contract, a notice in English and Spanish in at least 10-point font as follows:

### NOTICE TO COSIGNER (Traducción en Inglés Se Requiere Por La Ley)

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of *your* credit record.

This notice is not the contract that makes you liable for the debt.

### AVISO PARA EL FIADOR (Spanish Translation Required By Law)

Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

14      14.     The notice required by Section 1799.91 (the "1799.91 Notice") makes clear the

following information, which would be material to a reasonable consumer:

    a.   The bail bond credit arrangement is a legal debt.

    b.   The co-signer will be liable for the debt if the arrestee does not pay.

    c.   The co-signer may be liable for collection fees and other late fees if the arrestee does not pay.

    d.   The creditor may ask the co-signer to make payments without first asking the arrestee to do so.

    e.   The creditor can sue the co-signer, or garnish their wages, to enforce the debt obligation.

    f.   The bail bond credit arrangement may affect the co-signer's credit record.

## II.   Aladdin Does Not Comply with California Law for Consumer Credit Contracts

15.   When Aladdin offers credit bail financing services in connection with a bail bond transaction, it generally requires at least one friend or family member of the accused to co-sign the credit agreement.  The co-signer, who Aladdin also calls an "indemnitor," is purportedly put on the hook not just for the cost of the bail bond premium (*i.e.*, the $10,000 discussed above), but also the amount of any forfeited cash bail (*i.e.*, the full $100,000 bail, if the accused fails to appear), as well as any costs related to enforcement.

16.   Aladdin generally requires accused individuals and their co-signers to sign a standard set of documents to process bail: an "Indemnity Agreement for Surety Bail Bond," a "General Conditions of Bail" sheet, and a "Promissory Note."  These agreements are interdependent and part of the same transaction.  In or around 2019, Aladdin modified its standard form so that all provisions that previously appeared in three separate documents now appear within a single document titled an "Indemnity Agreement."  Regardless of their form, to the extent one or more of the provisions in the documents associated with any transaction purport to make a co-signer liable for an extension of credit, they constitute a consumer credit contract within the meaning of California Civil Code Section 1799.90.

17.   Aladdin's goal is to make each co-signer fully responsible for payment of the extension of credit through which the bail bond premium is financed.  Thereafter, Aladdin and

other debt collectors (including Defendant AWA Collections) regularly follow up with co-signers to ask them to pay off the balance of the extension of credit.

18.     However, Aladdin did not consistently provide co-signers with the Section 1799.91 Notice that informs them of their rights and the consequences of signing before asking them to co-sign the aforementioned agreements until approximately February 2022.  This failure renders the co-signor obligations under the agreements invalid and unenforceable.  On February 28, 2022, Two Jinn e-mailed its California retail managers advising them that "the attached notice [reproducing the Section 1799.91 Notice] shall be included with *each* CA bail transaction, regardless of the upfront premium collected, requiring a signature from *each* cosigner within the transaction."  (TJ-MM-00000893.)

19.     Nevertheless, Aladdin regularly attempts to collect from co-signers who were not provided the Section 1799.91 Notice so who have no valid or enforceable debt obligations to Aladdin.  Indeed, Aladdin's business is organized around debt collection.  Its Financial Services Division consists of three Departments depending on how long it has been since a payment has been made to an outstanding premium balance.  The "Front" Department handles "current accounts to accounts that are 59 days delinquent."  The "Mid-End" Department handles "accounts that are 60-90 days delinquent."  The "Back-End" Department handles "accounts that are 91-120 days delinquent."  And there are also in-house departments that handle small claims recovery efforts and superior court recovery efforts.  As Aladdin's policy documents explain, "[t]he Financial Services Division is responsible for all debt recovery efforts until the bond obligation is either (1) paid in full; (2) [a]fter 90 days of delinquency pursued to judgment in Small Claims/Superior Court or compromised pursuant to an authorized settlement agreement; or (3) written off as an uncollectable debt to a 3rd party collection agency."  (TJ-MM-00000332.)

20.     Each of these collection stages includes various representations to co-signers, including Plaintiffs and proposed Class members, that they owe a debt—even though they owe no such debt if the Section 1799.91 notice was not provided.  For example, the Front-End Team's responsibilities include mailing out an "Intro Letter," verifying the payment plan and all telephone numbers and addresses, collecting email addresses, and mailing out a current statement

15 days before the pay plan due date that "indicates balance outstanding, monthly payment due and due date." (TJ-MM-00000336.)

21.     If, after the payment due date, the payments received are lower than those expected, then Aladdin sends co-signers a "30-Days Late statement." This process is repeated in advance of every payment due date until Day 59, at which point the account is cycled to the "Mid End" Department. (TJ-MM-00000337.) For any accounts deemed "Underpaid" and which are over 18 months old, Aladdin's policy states that, "[o]ur pitch to the defendant/indemnitor that the account has been flagged because the contract terms are up and balance in full is due and payable immediately," and "[g]ive them the Legal T/O for Small Claim areas, advise them that you are working the account, and that the monthly statements are now stopped due to the account being due in full." (*Id.*)

22.     Similarly, Aladdin's Mid-End Department's standard operating procedure for "all bonds that reach a delinquency of 60 days and up to 90 days" is that "[d]elinquent debt recovery efforts continue until the bond obligation is either (1) current; (2) paid in full; (3) escalated to Back-End." (TJ-MM-0000039.) These efforts include that "[a] demand for payment is made," collection of updated telephone numbers and mailing addresses, "ASK FOR PAYMENT IN FULL; if not then explain the need for compliance to the Promissory Note," and a "90-Days late letter is generated on the date the acct becomes 90-Days late." (*Id.*)

23.     The Mid-End Department "is also responsible for all bonds that reach a delinquency of 91 days and up to 120 days." (TJ-MM-00000340.) Its policy for such accounts is that "[d]elinquent debt recovery efforts continue until the bond obligation is either (1) current; (2) paid in full; (3) escalation to pursue a civil judgment in Small Claims/Superior Court. (4) Written off to 3rd party collections." (*Id.*) These efforts include "[a] demand for full delinquent payment is made," the verification of telephone numbers and mailing addresses, "ASK FOR PAYMENT IN FULL; if not then explain the need for compliance to the Promissory Note," and, finally, "[a]t 80+ days delinquency the Mid-End Collector has authority to give a legal demand if there are viable assets . . ., there are no disqualifying factors*, and they have properly prepared the file." (*Id.*). The standard Legal Demand is: "I'm forwarding your bond to our small claims

team with recommendation that a lawsuit be filed in Small Claims or Superior Court so that we can obtain a civil judgment.  If and when a civil judgment is granted it may result in a possible wage garnishment or a lien placed on your real estate property."  (TJ-MM-00000341.)

24.     If these efforts fail, "[i]t is the general policy of Two Jinn Inc. dba Aladdin Bail Bonds to pursue any debtor (with an apparent ability to pay) that ultimately refuses to fulfill his/her contractual obligations or otherwise enter into an acceptable settlement or payment arrangement.  Parties that refuse to pay (who have money[,] a credit score of 650 or above, or viable assets) or settle will be pursued in either Small Claims or Superior Court depending on the amount of the outstanding balance."  (TJ-MM-00000374.)

25.     Aladdin's written correspondence to co-signers, such as Plaintiffs and the proposed Class Members, is by template.  For example, shortly after a proposed class member co-signs on a bail bond premium, Aladdin sends a standard "Introduction Letter."  The standard Introduction Letter to co-signers, including those who were not provided the required Section 1799.91 Notice, includes numerous misleading statements with respect to the invalid debts.  At the top of the letter, one line reads: "Total Amount Due: $[amount filled in]," suggesting the co-signer has a debt obligation in that amount.  (TJ-MM-00000393.).  Among other things, the letter also states: "Your first payment, which is based on the Promissory Note you signed, will be due 30-days from the date the bond was issued."  (*Id.*)  These statements are false and misleading because a co-signer who was not provided the Section 1799.91 Notice does not owe a valid or enforceable debt to Aladdin.  Yet the "Introduction Letter" creates the opposite impression.

26.     Then, if the account is at least 90 days past due, Aladdin sends a letter titled a "Final Demand Notice."  (TJ-MM-00000395.).  At the top, the letter includes two lines that identify the "Amount Past Due" and the "Acct Balance."  This representation is false and misleading as to co-signers who were not provided the Section 1799.91 Notice, because such individuals have no valid or enforceable debt owed to Aladdin, yet the letter creates that impression.  Further, the letter states that its "purpose" "is to inform you that the above referenced account is now more than 90 days past due."  It states that "failure to contact us within 5 days from the letter date shown above will result in your account automatically being

escalated in our Internal Collection Process, where your payment options may be far less flexible."  Such statements are also false and misleading because a non-existent debt obligation cannot be past due.  And it is threatening because it implies that legal action will follow a failure to communicate with Aladdin and make additional payments.

27.     Another standard letter also identifies the "Amount Due" at the top, even though co-signers who weren't provided a Section 1799.91 Notice owe nothing to Aladdin.  (TJ-MM-00000396.).  This letter states that "Two Jinn, Inc. . . . has repeatedly attempted to assist you in fulfilling your contractual obligation in connection with the above-referenced bail bond. Unfortunately, those efforts have been unsuccessful. As a result, your account has been assigned to Aladdin's Internal Collections Department for further EVALUATION of the legal remedies available to Aladdin."  Like the letters above, this letter falsely suggests that the proposed class member owes a debt to Aladdin, even though that is not the case, and threatens legal action to enforce the debt in case the co-signer fails to contact Aladdin.

28.     Eventually, Aladdin outsources its collection efforts to a third-party debt collector, Defendant Adler Wallach & Associates, Inc., known as AWA Collections.

29.     AWA's collection tactics include telephone calls, letters, and credit reporting. AWA's template collection letters to proposed Class members, like Aladdin's, include numerous false statements and unlawful threats.

30.     For example, one template lists the "Total Balance Due" at the top, and states that the account "has been assigned to this agency for collection" and that "you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations."  (AWA0143.).  As above, the representations are inaccurate because the underlying debt is not valid or enforceable against proposed class members who were not provided the Section 1799.91 Notice when they co-signed.

31.     Another version of AWA's standard template collections letters reproduces the "Total Balance Due" at top, and then states that "[w]e find it necessary to write to you again regarding this seriously delinquent account.  We cannot help if you don't take the time to contact

our office." (AWA0144.)

32.     As with the other examples, these collections letters misrepresent the status of the debt by claiming there is a debt at all with respect to co-signers who were not provided the Section 1799.91 Notice.  They also create the implication that adverse action may be taken against a co-signer who fails to make further payments on the debt, even though they have no obligation if they were not provided the Section 1799.91 Notice.

33.     AWA Collections also made phone calls and trained its employees on the kinds of misleading statements and threats they could use to pressure co-signers to make additional payments, even if they weren't provided a Section 1799.91 Notice.  For example, AWA Collections' standard policies and practices regarding collections confirm that it uses the threat or fact of credit reporting to pressure consumers to make payments even when the underlying debt is invalid.  Its Training Manual for personnel making phone calls includes example statements like: "This is hurting your credit (or will soon.) You owe this balance; how would you like to take care of it?"  (AWA0022.).  Another AWA policy document states that "Rule Number One" is "Friendly but not their friends."  (AWA0033.). "A softer, more helpful approach is definitely preferable to a 'Pay or Die' stance. However, this method will not work if you are not firm about getting what is owed . . . .  Here are a few suggestions[.]"  (*Id.*).  The suggestions include "Explain the long-term benefits of paying off debts," including "Improves credit scores which in turn helps debtors qualify for credit," and "[p]aying off debts now will either prevent debt from being reported to credit bureaus or will enable reported accounts to be updated with a more favorable status."  (*Id.*).  Other suggestions include that "[p]aying a debt now instead of delaying payment will, in some cases, prevent escalation to legal."  (*Id.*)

## II.    Aladdin Kept Taking Money From Co-Signers Even Though It Knew The Debts Against Those Who Did Not Receive a Section 1799.91 Notice Were Invalid

34.     In January 2022, Aladdin finally took steps to comply with Section 1799.91 and instructed AWA to stop proactive collection efforts against co-signers who were not provided the Section 1799.91 Notice.  On January 3, 2022, Aladdin's Norma Ross e-mailed AWA Collections to advise: "Effective immediately this goes on every account.  Please stop calls and collections

efforts on all cosigners for bonds dated before 5/01/2019.  You can collect on defendants but not cosigners on those bonds.  Please don't file lawsuits on those either.  We can continue to accept Payments but don't collect on them."  (AWA0152.).  Ms. Ross's e-mail followed the California Court of Appeal's decision in *BBBB v. Caldwell*, which was issued on December 29, 2021.

35.     However, for years prior to that date, Aladdin was actively misleading and misinforming proposed Class members that they were obligated to make payments on those invalid and unenforceable debts.  Instead of taking prompt corrective action, such as retracting its prior representations and notifying those individuals that Aladdin had been mistaken and that no further payments were required, Aladdin specifically instructed AWA to "continue to accept Payments" from such individuals, knowing full well that they were not obligated as co-signers due to the failure to provide them the Section 1799.91 Notice.

36.     On January 10, 2022, AWA Director Harley Marchbank responded to Ms. Ross's e-mail.  Mr. Marchbank stated: "My team has identified the accounts that you asked about. Its [sic] over 100K accts."  (AWA0151.)  Mr. Marchbank also stated: "We also need to clarify what you think is a pause. Not calling, holding new notices, is one thing, but credit reporting is still a collections action, and we update credit reports every week. So, every weekly file update is a collections action."  (*Id.*).  On January 12, 2022, Ms. Ross responded to agree with Mr. Marchbank that the "pause" should include credit reporting, indicating Aladdin agreed credit reporting constitutes a debt collection activity.  (*Id.*).  However, as Ms. Martinez's experience below demonstrates, Aladdin and AWA continued to furnish information about the invalid debts to credit bureaus even after January 2022.

## FACTS SPECIFIC TO PLAINTIFFS

### I.     Plaintiff Medina

37.     On May 11, 2018, Aladdin asked Ms. Medina to co-sign a consumer credit contract financing a bail bond premium of $16,000 to enable her former boyfriend (to whom she was not married) to be released from jail pending trial.  Ms. Medina made a one-time "down payment" of $10,000 on May 11, 2018, and the contracts purported to make Ms. Medina financially liable for the balance under a payment schedule.  She was not the only signatory on

1   the financing agreement.

2      38.     As part of that transaction, Ms. Medina signed a "Promissory Note" with specific

3   information about the extension of credit.  The Promissory Note specifically incorporates the

4   related Indemnity Agreement, stating at the bottom: "I have read the indemnity agreement and

5   agree to the terms of this promissory note."  In relevant part, the "Indemnity Agreement" merely

6   purports to impose the same credit obligations as the Promissory Note, including a statement that

7   the Indemnitor "must . . . pay the bail bond premium."  Paragraph 2, titled "Premium," purports

8   to make Ms. Medina liable for the full amount of the bail bond premium, and Paragraph 4, titled

9   "Indemnification," purports to make Ms. Medina liable for any breaches of her agreements to

10  pay the premium.  To the extent any provision of the Indemnity Agreement is merely a backstop

11  for the credit obligations arising under the Promissory Note, those provisions are also invalid for

12  failure to provide her with the Section 1799.91 Notice.

13     39.     At no time before asking Ms. Medina to sign the documents forming a consumer

14  credit contract did Aladdin provide her with the legal notice required by California Civil Code §

15  1799.91, which, as depicted above, would have made clear that there were significant legal and

16  financial ramifications for Ms. Medina if she co-signed the extension of credit but thereafter

17  failed to make all the required payments.  Instead, Aladdin put Ms. Medina under the impression

18  that her signature was merely needed to process her former boyfriend's release from jail, not that

19  doing so would create an ongoing set of financial obligations and liabilities for her, or expose her

20  to harm to her credit.

21     40.     Ms. Medina would not have agreed to cosign or provide payments (including any

22  down payment) under any consumer credit contract if Aladdin had provided her with the notice

23  required by California Civil Code § 1799.91 explaining to her the true consequences of

24  cosigning the agreements.  Had such notice been provided, it would have been right above the

25  signature lines and Ms. Medina would have seen it.

26     41.     After Ms. Medina signed the consumer credit contract, Aladdin representatives

27  frequently and repeatedly called her and sent her letters demanding that she make additional

28  payments, without advising her that she in fact was not obligated under any consumer credit

1   contract.

2   42.   According to Aladdin's records produced in discovery to date, Aladdin

3   representatives called Ms. Medina to demand that she make additional payments at least half a

4   dozen times from May to October 2018.  In each of the calls that was completed, Aladdin falsely

5   claimed that Ms. Medina had an obligation to make those payments as a co-signer,

6   notwithstanding that Ms. Medina had not been provided the Section 1799.91 Notice.

7   Additionally, Aladdin sent her over half a dozen misleading demand letters from May to

8   November 2018, falsely stating that she owed money on the bail bond premium balance, and

9   suggesting that failure to make additional payments would expose her to an escalation of

10   collections activities and possible legal consequences.  These letters were sent on the

11   "Introduction Letter," "Final Demand," "30 Days Late," and settlement offer templates described

12   above.

13   43.   Aladdin's collection efforts don't stop when it sends its final demand notice.

14   Instead, at that point, it recruits AWA Collections' assistance to continue collecting on these debt

15   obligations on its behalf, notwithstanding that the co-signers are not obligated on the debts for

16   failure to provide Section 1799.91 Notice, and that such collection efforts are unlawful.

17   44.   For example, discovery produced by AWA confirms that, at Aladdin's behest,

18   AWA made false adverse credit reports to credit bureaus that Ms. Medina was past due on non-

19   existent debt obligations stemming from bail bond premium financing agreements with Aladdin

20   on October 16, 2021, November 19, 2021, December 8, 2021, and December 20, 2021.  These

21   reports were made even though Ms. Medina disputed her liability for the debts in question with

22   AWA at least as early as on or around May 17, 2019, June 11, 2019, March 21, 2021, November

23   2, 2021.  The debts were not valid against her because she was never provided the Section

24   1799.91 Notice.

25   45.   Because Aladdin failed to provide the 1799.91 Notice to Ms. Medina, the

26   consumer credit contract is invalid, unlawful, and unenforceable, and the sums collected by

27   Aladdin or any debt collectors, including but not limited to AWA Collections, pursuant to the

28   agreement were collected unlawfully.  Additionally, other debt collection efforts—including

credit reporting, demand letters, and demand calls—were also unlawful insofar as they falsely claimed that Ms. Medina was obligated on the debts even though she hadn't been provided the Section 1799.91 Notice.

46.     Consequently, Ms. Medina, like the proposed Class Members, is entitled to a refund of all payments she made pursuant to the consumer credit contract to Aladdin or any debt collectors working to collect on that unenforceable obligation, including but not limited to AWA Collections, a declaration that the consumer credit contract is invalid and unenforceable, and an injunction prohibiting Aladdin and any of the aforementioned debt collectors, such as AWA Collections, from seeking, demanding, or collecting payments from any proposed Class Member pursuant to any consumer credit contract.

## II.     Plaintiff Martinez

47.     Ms. Martinez had a similar experience to Ms. Medina.

48.     On November 3, 2019, Aladdin asked Ms. Martinez to co-sign a consumer credit contract financing a bail bond premium of $500.00 so her boyfriend (to whom she was not married) could be released from jail. Ms. Martinez made a "down payment" of $120.00 on November 3, 2019.  The contract purported to make Ms. Martinez financially liable for the balance under a payment schedule.  She was not the only signatory on the contract associated with this transaction.

49.     The contract Ms. Martinez signed was titled an "Indemnity Agreement for Surety Bail Bond."  The terms of the Promissory Note were not in a separate document, but rather incorporated into Paragraph 3 of the Indemnity Agreement.  As with Ms. Medina, in relevant part, the "Indemnity Agreement" purports to impose the same credit obligations as the Promissory Note obligations in Paragraph 3, including a statement that the Indemnitor "must . . . pay the bail bond premium."  Paragraph 2, titled "Premium," purports to make the Indemnitor liable for the full amount of the bail bond premium, and Paragraph 5, titled "Indemnification," purports to make Ms. Martinez liable for any breaches of her agreements to pay the premium. To the extent any provision of the Indemnity Agreement is merely a backstop for the credit obligations arising under the Promissory Note, those provisions are also invalid as to Ms.

Martinez for failure to provide her with the Section 1799.91 Notice.

50.     Aladdin put Ms. Martinez under the impression that her signature was merely needed to process her boyfriend's release from jail, not that doing so would create an ongoing set of financial obligations and liabilities for her.  The 1799.91 Notice was not provided to Ms. Martinez before she co-signed that bail bond.  Had such notice been provided, it would have been right above the signature lines and Ms. Martinez would have seen it.

51.     Ms. Martinez would not have agreed to cosign or provide payments (including any down payment) under the consumer credit contract if Aladdin had provided her with the notice required by California Civil Code § 1799.91 explaining to her the true consequences of cosigning the agreements.

52.     In June 2022, Ms. Martinez attempted to obtain copies of the contract she signed from Aladdin, but Aladdin instead provided her copies of its then-current contract templates, which were made to look as if they were the operative agreement that applied to Ms. Martinez. Aladdin filled her name into the contract as well as that of other signatories, but the documents did not have any signatures on them, and were dated June 2022 (the date of her request), rather than the date she actually entered into the operative contract.  Aladdin's failure to provide Ms. Martinez with copies of the original contracts is misleading and, upon information and belief, designed to conceal the fact that the original contract lacked the required 1799.91 Notice.

53.     On February 3, 2020, Ms. Martinez received a letter from Aladdin titled "FINAL DEMAND NOTICE," one of the template letters described above.  The letter claimed the 2019 bail bond premium payments were more than 90 days past due, even though Ms. Martinez did not owe any amount to Aladdin.  The letter also threatened that if she did not contact Aladdin and "make acceptable payment arrangements" her account would be escalated to the Internal Collations Process where her "payment options may be far less flexible."  At no point did this letter inform Ms. Martinez that the financing agreement reflected in the contracts were in fact invalid and unenforceable; to the contrary, the letter led Ms. Martinez to believe she had an obligation to make payments or would face serious consequences.

54.     That was not the only collection effort by Aladdin on the financing agreement

reflected in the consumer credit contract she signed.  According to Aladdin's records, Aladdin made collections calls to Ms. Martinez repeatedly and frequently in late 2019 and early 2020, calling her at least on November 19, 2019; December 13, 2019; December 17, 2019; December 27, 2019; January 7, 2020, January 15, 2020; January 23, 2020; and January 31, 2020.  In each of the calls that was completed, Aladdin falsely claimed that Ms. Martinez had an obligation to make those payments as a co-signer, notwithstanding that Ms. Martinez had not been provided the Section 1799.91 Notice.  Additionally, Aladdin sent her at least five misleading demand letters from November 2019 to March 2020, falsely stating that she owed money on the bail bond premium balance, and suggesting that failure to make additional payments would expose her to an escalation of collections activities and possible legal consequences.  These letters were sent on the "Introduction Letter," "Final Demand," "30 Days Late," and settlement offer templates described above.

55.     As with Ms. Medina, Aladdin's collection efforts did not stop when it sent Ms. Martinez a final demand notice.  Instead, at that point, it recruited AWA Collections' assistance to continue collecting on these debt obligations on its behalf, notwithstanding that the co-signers are not obligated on the debts for failure to provide Section 1799.91 Notice, and that such collections efforts are unlawful.

56.     For example, discovery produced by AWA confirms that, at Aladdin's behest, AWA made false adverse credit reports to credit bureaus that Ms. Martinez was past due on non-existent debt obligations at least in or around October 2021, November 2021, December 2021, January 2022, and February 2022.

57.     As a consequence of one such report, on or around June 24, 2022, AWA Collections, acting on behalf of Defendant Aladdin, furnished information to a national credit reporting agency alleging that the 2019 bail bond premium payments were "seriously past due date," even though Aladdin and AWA Collections knew or should have known these debts were not valid or enforceable as to Ms. Martinez.  Ms. Martinez's credit score dropped by approximately 18 points as a result of AWA Collections furnishing information about these debts to the credit reporting agency.

58.     Ms. Martinez did not receive any letter from AWA Collections before it reported the invalid and unenforceable bail bond debt to the credit reporting agency, despite being required to do so.  As a result she did not have the ability to challenge the validity of the debt before it was placed on her credit report.

59.     It appears AWA Collections was engaged in an unfair debt collection practice known as "debt parking," which would explain why it did not communicate with Ms. Martinez first.  "Debt parking" happens when a debt collector furnishes negative credit information about a consumer to a credit reporting agency, without first attempting to communicate with the consumer about the alleged debt.  The debt collector does so in order to pressure the consumer to make contact with the debt collector and then make payments to clean up their credit reports.  By "parking" the debt on Ms. Martinez's report, AWA Collections pressured her to make payments on the alleged debt to get the negative information off her report, even though the debt was not valid or enforceable to begin with.

60.     Due to AWA and Aladdin's unlawful actions, Ms. Martinez contemplates obtaining credit in the near future, but is worried she will be charged higher rates because of the significant drop in her credit score.  Ms. Martinez would like to apply for a consumer loan, but now will have to wait until she can get her credit score restored to apply for that loan.  She is distressed by this sudden drop in her credit score.

61.     Because Aladdin failed to provide the 1799.91 Notice to Ms. Martinez, those agreements are unlawful, invalid, and unenforceable, and the sums collected by Aladdin or any debt collectors, including but not limited to AWA Collections, pursuant to the agreements were collected unlawfully.  Additionally, other debt collection efforts—including credit reporting, demand letters, and demand calls—were also unlawful insofar as they falsely claimed that Ms. Martinez was obligated on the debts even though she had not been provided the Section 1799.91 Notice

62.     Consequently, Ms. Martinez, like the proposed Class Members, is entitled to a refund of all payments she made pursuant to a consumer credit contract to Aladdin or any debt collectors working to collect on an invalid and unenforceable consumer credit contract, including

but not limited to AWA Collections, a declaration that the consumer credit contract is invalid and unenforceable, and an injunction prohibiting Aladdin and any of the aforementioned debt collectors, such as AWA Collections, from seeking, demanding, or collecting payments from any proposed Class Member pursuant to such consumer credit contracts.  Ms. Martinez also seeks statutory and punitive damages in connection with the Rosenthal Fair Debt Collection Practices Act and the Consumer Credit Reporting Agencies Act.

## CLASS ALLEGATIONS

63.     **Class Definition**: Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All people who cosigned a bail bond consumer credit contract from Two Jinn, Inc. or its subsidiaries or affiliates, which did not include the notice described in California Civil Code Section 1799.91 prior to signing, and who (1) owed, were asked to make, or made a payment on or after March 23, 2018, to Two Jinn, Inc. or any debt collector working to enforce such consumer credit contracts; and (2) were not a spouse of the person who received release services under the contract at the time of cosigning.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

64.     **Numerosity**: On information and belief, the proposed Class definition includes hundreds of thousands of people.  Members of the Class can be identified through Defendants' records.

65.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any

questions that may affect individual members of the Class.  Common questions for the Class include, but are not necessarily limited to the following:

a.   Whether the bail bond premium financing agreements described above constitute consumer credit contracts under California Civil Code § 1799.90;

b.   Whether Aladdin failed to provide Plaintiffs and the proposed Class Members with the notice required by California Civil Code § 1799.91 prior to having them sign a consumer credit contract;

c.   Whether Aladdin attempted to collect payment from Plaintiffs and the proposed Class Members directly, or through debt collectors such as AWA Collections, under the invalid and unenforceable consumer credit contracts;

d.   Whether the aforementioned actions constituted unlawful, unfair, or fraudulent business acts or practices within the meaning of California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*;

e.   Whether Plaintiffs and the proposed Class Members suffered injury in fact and lost money or property as a result of Defendants' unlawful conduct within the meaning of California Business & Professions Code § 17204;

f.   Whether Defendants were unjustly enriched by retaining the amounts received from Plaintiffs and Class Members under the consumer credit contracts;

g.   Whether Plaintiffs and the proposed Class Members are entitled to restitution and injunctive relief, *see* California Business & Professions Code § 17203;

h.   Whether Plaintiffs and the proposed Class Members are entitled to refunds of all amounts collected from them pursuant to unlawful and unenforceable co-signer agreements, and the amount of such refunds;

i.   Whether Plaintiffs and the proposed Class Members are entitled to disgorgement of ill-gotten profits from Defendants, in an amount not exceeding their out-of-pocket losses; and,

j.   Whether Plaintiffs and the proposed Class Members are entitled to a declaration that the co-signer agreements are unlawful and unenforceable, and

injunctive relief prohibiting Defendants or their agents from seeking to collect from them on those agreements, including by misleading or providing false statements to Class Members, or furnishing information to credit reporting agencies claiming that Class Members owe a debt in connection with these consumer credit contracts.

66.   **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and the members of the Class were harmed, and face ongoing harm, arising out of Defendants' wrongful conduct.

67.   **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money they would not have otherwise lost because of Defendants' unlawful conduct.  Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to the Class.

68.   **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive and declaratory relief appropriate with respect to the Class as a whole.  The policies that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.  The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Class are the same.

69.   **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of

1   this controversy.  The harm suffered by the individual members of the Class is likely to have

2   been relatively small compared to the burden and expense of prosecuting individual actions to

3   redress Defendants' wrongful conduct.  Absent a class action, it would be difficult for the

4   individual members of the Class to obtain effective relief from Defendants.  Even if members of

5   the Class themselves could sustain such individual litigation, it would not be preferable to a class

6   action because individual litigation would increase the delay and expense to all parties and the

7   Court and require duplicative consideration of the legal and factual issues presented.  By

8   contrast, a class action presents far fewer management difficulties and provides the benefits of

9   single adjudication, economy of scale, and comprehensive supervision by a single Court.

10  Economies of time, effort, and expense will be fostered and uniformity of decisions will be

11  ensured.

12      70.    Plaintiffs reserve the right to revise each of the foregoing allegations based on

13  facts learned through additional investigation and in discovery.

**COUNT I**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")**
**Unlawful and Unfair Business Practices**

16      71.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

17      72.    Defendant Two Jinn, Inc.'s bail bond premium financing agreements, described

18  above, constitute "consumer credit contracts" under California Civil Code § 1799.90(a).  The

19  contracts create an obligation to pay money on a deferred basis; the money, property, services, or

20  other consideration that are the subject matter of the contract, is primarily for personal, family, or

21  household purposes; they are loans or extensions of credit secured by other than real property, or

22  unsecured, for use primarily for personal, family, or household purposes; and they are retail

23  installment contracts.  As indicated by the term "co-signor," Plaintiffs and the Class Members

24  were not the only signatories of the agreements; each was also signed by at least one other

25  person.

26      73.    Defendants' conduct was unlawful.  Defendant Two Jinn, Inc. did not provide

27  Plaintiffs or the Class Members with the notice required by California Civil Code § 1799.91 at

28  any time prior to signing or enforcing the consumer credit contracts.  This was a violation of

---

1   Section 1799.91.  Additionally, notwithstanding its failure to provide the required notice,

2   Defendant Two Jinn, Inc., and its agents and debt collectors, including Defendant AWA

3   Collections, demanded payments and took steps to enforce the consumer credit contracts against

4   Plaintiffs and the Class, even though they agreements were invalid and unenforceable pursuant to

5   California Civil Code §§ 1799.91 and 1799.95.  Section 1799.91 makes explicit that the Section

6   1799.91 Notice "shall" be provided to a co-signer "*prior to that person's becoming obligated on*

7   *the consumer credit contract.*"  Cal. Code Civ. Proc. § 1799.91(a) (emphasis added).

8   Additionally, Section 1799.95 prohibits attempts to collect against co-signers who are not

9   provided the requisite notice.  Thus, these acts were unlawful.

10          74.     Defendants' acts were also unlawful under the UCL because, as explained below,

11   they violated the Rosenthal Act's prohibition on false and misleading collection efforts.

12          75.     Defendants' credit reporting acts were also unlawful under the UCL because, as

13   explained below, they violated the California Consumer Credit Reporting Agencies Act.

14          76.     Defendants' conduct was also unfair.  Defendants' attempt to seek, demand, or

15   collect payments from Plaintiffs and the Class pursuant to the consumer credit contracts

16   constitute an unfair business practice.  These acts offend an established public policy of

17   providing co-signors with the notices required by Section 1799.91 before they become obligated

18   on the credit contracts, and forbidding creditors or debt collectors from enforcing debts against

19   co-signors where such notice was not provided.  The practice is also immoral, unethical,

20   oppressive, unscrupulous, or substantially injurious to consumers.  The substantial injury to

21   Plaintiffs and the Class is not outweighed by any countervailing benefit to them or the public,

22   and Plaintiffs and the Class cannot reasonably avoid and have been harmed by such injury.

23   There are no countervailing benefits to the public from Defendant Two Jinn, Inc.'s practice of

24   failing to provide the Section 1799.91 Notice to co-signors, nor from Defendants' collection

25   efforts against co-signors who were not provided that Notice.  To the contrary, the California

26   Legislature has decided by enacting Section 1799.90, *et seq.*, that the public interest is best

27   served by creditors like Defendants providing the Section 1799.91 Notice to co-signors, and

28   prohibiting them from attempting to collect against co-signors when that Notice is not provided.

There is no significant cost to Defendants to provide the Section 1799.91 Notice to cosigners. Defendants can easily remedy this issue while continuing to provide bail bond services to the general public by merely bringing their businesses into compliance with California law by providing the requisite legal notice when they agree to sell a bail bond premium on credit.

77.     Plaintiffs and the proposed Class Members have suffered injury in fact and have lost money or property as a result of Defendants' unlawful and unfair conduct, including all sums collected by Defendants from Plaintiffs and the proposed Class Members pursuant to the unlawful contracts.  These sums include but are not limited to the initial down payment, subsequent payments, and payments for interest and any associated fees.  Plaintiffs and the Class would not have paid money to, or entered into the consumer credit contracts with, Defendants if they had received the 1799.91 Notice.

78.     California's Unfair Competition Law ("UCL"), Business & Professions Code § 17203, specifically authorizes this Court to issue equitable relief in the form of restitution and an injunction to redress past acts and to enjoin ongoing acts of unfair competition and unlawful conduct.

79.     Plaintiffs and the proposed Class Members seek restitution in the form of refunds of all amounts unlawfully collected and the disgorgement of Defendants' ill-gotten profits, not exceeding their out-of-pocket losses.  Plaintiffs and the proposed Class Members have no adequate remedy at law.

80.     Restitution of all amounts paid by Plaintiffs and the proposed Class Members is permitted because Plaintiffs and the proposed Class Members received nothing of economic value in exchange for the payments they made.  The benefit of the service of release accrues only to the person who is bailed out, not the co-signor.  Proposed Class Members received only the intangible benefit of securing the freedom of a friend or loved one after the initial payment. Proposed Class Members received nothing at all after any subsequent payments that were made, either.

81.     To the extent the bail bond premiums have economic value to the individuals who were bailed out, it is not reflected by Two Jinn's advertised prices, but the cost of actually

providing the service.  That cost is virtually zero.  Two Jinn takes on very little risk with each bail bond transaction because the courts almost never require Two Jinn or its surety to make any payments associated with forfeited bail.  For example, Two Jinn's surety and parent corporation, Seaview Insurance Company, has reported loss ratios of nearly 0% to the California Department of Insurance every single year since it entered the market.  Seaview's 2011 application to the California Department of Insurance admitted that "sureties consistently incur extremely low losses" on bail bonds and "it is not at all uncommon in the commercial bail industry for bail sureties consistently to experience loss ratios at or just slightly above 0.0%."  Accordingly, the true economic value of a bail bond premium to the person bailed out is far lower than whatever Plaintiffs and the proposed Class paid and what Two Jinn claims it to be.  Regardless, the benefit of the bail bond release services goes to the person who is bailed out, not the cosigners like Plaintiffs and the proposed Class Members.

82.     Thus, Plaintiffs and the proposed Class Members are entitled to restitution for the full amounts that were paid to Defendants on invalid and unenforceable debt obligations because they received nothing of economic value in return.

83.     Plaintiffs, on behalf of themselves and the Class, seek a declaration holding those consumer credit contracts invalid and unenforceable under California Civil Code §§ 1799.91 and 1799.95, and an order from the Court requiring Defendants to return all payments made on invalid and unenforceable agreements to the Class and enjoining Defendants from collecting on or enforcing any of the unlawful consumer credit contracts against Plaintiffs or the Class.

**COUNT II**
**Cal. Civ. Code §§ 1788, *et seq.***
**Rosenthal Fair Debt Collection Practices Act**

84.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

85.     Defendants' acts and omissions constitute numerous and multiple violations of the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act").

86.     Defendant Aladdin and Defendant AWA Collections are "debt collectors" because, among other reasons, Defendants, in the ordinary course of business, regularly, on behalf of themselves or others, engage in debt collection.  Cal. Civ. Code § 1788.2(c).

87.     Plaintiffs and Class Members are "debtors" because they are natural persons from whom a debt collector seeks to collect a consumer debt that is due and owing or alleged to be due and owing from such person. *Id*. § 1788.2(h).

88.     The consumer credit contracts are "consumer debts" because they are money, property, or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction. *Id.* § 1788.2(f).

89.     Defendants and their agents transmit oral and written communications to Plaintiffs and Class Members attempting to collect debts. These communications are described above, and include but are not limited to the collections calls made to Plaintiffs and Class Members, the collection letters sent to Plaintiffs and Class Members, and furnishing credit information about Plaintiffs and Class Members to a credit bureau.

90.     Defendants' acts were done intentionally with the purpose of coercing Plaintiffs and Class Members to pay the alleged debt.

91.     In their communications with Plaintiffs and the Class, Defendants and their agents regularly, willfully, and knowingly used false, deceptive, and misleading representations or means of collection in violation of the Rosenthal Act, including, but not limited to, falsely representing that Plaintiffs and Class Members owed a debt. Examples of these misrepresentations are described above and incorporated herein.

92.     For example, the collections calls Aladdin made to Ms. Martinez in late 2019 and early 2019, violated the Rosenthal Act. As alleged above, Aladdin called her at least on November 19, 2019; December 13, 2019; December 17, 2019; December 27, 2019; January 7, 2020, January 15, 2020; January 23, 2020; and January 31, 2020.   Aladdin also called Ms. Medina at least half a dozen times from May to October 2018.

93.     Similarly, Aladdin sent at least half a dozen misleading demand letters to Ms. Medina from May to November 2018 falsely representing the existence and character of a debt obligation that she purportedly owed.  It also sent Ms. Martinez similar misleading collections letters at least five times from November 2019 to March 2020 misrepresenting that she owed money on invalid and unenforceable bail bond premium financing agreements.

94.     Through AWA, Aladdin also made false adverse credit reports to credit bureaus based on invalid and unenforceable debt obligations about Ms. Medina in or around October, November, and December 2021, and about Ms. Martinez in or around October, November, December 2021 and January and February 2022.

95.     All such calls, letters, credit reporting, and other collection efforts were part of a continuing course of conduct and a continuing violation of attempting to collect on invalid and unenforceable debt obligations from Ms. Medina and Ms. Martinez.

96.     Defendants and their agents, upon information and belief, furnished information about these unenforceable debts to national credit reporting agencies in an attempt to coerce Plaintiffs and the Class to make additional payments on the consumer credit contracts, even though they were invalid and unenforceable. Details about these credit reporting attempts are described above and incorporated herein.

97.     For example, Defendant AWA, on behalf of Defendant Two Jinn, made false adverse credit reports to credit bureaus that Ms. Medina was past due on non-existent debt obligations stemming from the consumer credit contracts with Aladdin on October 16, 2021, November 19, 2021, December 8, 2021, and December 20, 2021. Defendant AWA also made false adverse credit reports to credit bureaus that Ms. Martinez was past due on non-existent debt obligations related to the credit agreements with Aladdin at least in or around October 2021, November 2021, December 2021, January 2022, and February 2022.

98.     Defendants systematically violated the consumer protections set forth in the Rosenthal Act by knowingly and willfully engaging in abusive, misleading, and unfair debt-collection practices in violation of California Civil Code § 1788.17.  By inducing co-signers to sign the consumer credit contracts without providing them the 1799.91 Notice, misrepresenting the lawfulness of the debt and the consequences of nonpayment, and systematically attempting to extract money from Class Members by fear and threat, Defendants violated the Rosenthal Act. Defendants' violations of the Rosenthal Act include:

a. falsely representing the character, amount, and legal status of debt that was and is legally unenforceable against cosigners, California Civil Code § 1788.17 (incorporating 15 U.S.C. § 1692e(2)(A));

b. threatening to take actions related to collection or enforcement that cannot legally be taken, California Civil Code § 1788.10; *id.* § 1788.17 (incorporating 15 U.S.C § 1692e(5)); and

c. engaging in "debt parking" as an unfair means of collecting upon these unenforceable debts, California Civil Code § 1788.17 (incorporating 15 U.S.C § 1692f).

99.     As a direct and proximate consequence of Defendants' violations of the Rosenthal Act, the cosigners who did not receive a notice pursuant to California Civil. Code § 1799.91 were coerced or tricked into making payments in connection with legally invalid and unenforceable consumer credit contracts.

100.     Defendants and their agents attempted to collect from Plaintiffs and Class Members on the consumer credit contracts, even though they were invalid and unenforceable. Plaintiffs and Class Members suffered actual damages whenever they made payments on the consumer credit contracts, a debt they did not owe but were led to believe they did by Defendants and their agents.  Had they been informed the debts were unenforceable, they would not have made payments to Defendants or their agents.

101.     As a result of each and every violation of the Rosenthal Act, Plaintiffs and the Class seek actual damages, statutory damages, costs, reasonable attorneys' fees, injunctive and declaratory relief against the Defendants and their agents.

### COUNT III
### Cal. Civ. Code §§ 1785.1, *et seq.*
### Consumer Credit Reporting Agencies Act

102.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

103.     Defendants violated California Civil Code § 1785.25(a) when they furnished information to credit reporting agencies about debts allegedly owed by Plaintiffs and Class Members under the consumer credit contracts, which Defendants knew or should have known

were invalid and unenforceable.  As discussed above, Defendants made adverse credit reports against Ms. Medina based on invalid and unenforceable bail bond premium financing agreements in or around October, November, and December 2021, and against Ms. Martinez in or around October, November, and December 2021 and January and February 2022.

104.    California Civil Code § 1799.91 put Defendants on notice that they were required to include the Notice in their consumer credit contracts for co-signers.  California Civil Code § 1799.95 put Defendants on notice that if the consumer credit contracts did not include the Notice as required by Section 1799.91, then the consumer credit contracts were unenforceable.

105.    The foregoing violations were negligent and/or willful.  Defendants acted in knowing or reckless disregard of their obligations and the rights of Plaintiffs and other Class Members under California Civil Code § 1785.25(a).

106.    As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages, including, but not limited to, time spent remedying incorrect information on their reports, lowered credit score, receiving credit on less favorable credit terms or not at all, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

107.    Plaintiffs and Class Members are entitled to recover actual damages, punitive damages, injunctive relief, costs, and attorney's fees pursuant to California Civil Code § 1785.31.

### COUNT IV
**Declaratory Relief**
**Declaratory Judgment Act/Cal. Civ. Proc. § 1060**

108.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

109.    An actual controversy exists between the parties regarding the rights and obligations of Plaintiffs, Class Members, and Defendants pursuant to the consumer credit contracts signed by Plaintiffs and Class Members.  For example, Plaintiffs assert that Defendants may not collect, or attempt to collect, payments from them and the Class pursuant to the consumer credit contracts.  Defendants disagree and maintain that they may lawfully request payments from Plaintiffs and the Class pursuant to the consumer credit contracts.

110.     Plaintiffs and the Class are entitled to a declaration that Defendants' failure to comply with the requirements of California Civil Code § 1799.91 renders the consumer credit contracts unlawful and unenforceable and that, consequently, Defendants may not collect, or attempt to collect, payments from Plaintiffs and the Class pursuant to the invalid and unenforceable bail bond financing agreements.

## **PRAYER FOR RELIEF**

Plaintiffs Sara Medina and Alicia Martinez, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs Sara Medina and Alicia Martinez as representatives of the Class, and appointing their counsel as Class Counsel;

b)     Declaring that Defendants' conduct, as set out above, is unlawful and unfair under the UCL and California Civil Code §§ 1799.91, 1799.95, the Rosenthal Act, and the CCRAA;

c)     Declaring that the bail bond financing agreements are invalid and unenforceable as to Plaintiffs and the Class under the UCL and California Civil Code §§ 1799.91 and 1799.95;

d)     Declaring that attempts to collect from co-signers on the unenforceable bail bond financing agreements violate California Civil Code §§ 1799.91 and 1799.5, and the Rosenthal Act;

e)     Declaring Defendants' and their agents' furnishing of information to credit reporting agencies regarding debts purportedly owed under the financing agreement reflected in the bail bond financing agreements with respect to Plaintiffs and Class Members violates the Consumer Credit Reporting Agencies Act;

f)     Enjoining Defendants from engaging in any collection activity on, or seeking to enforce, the financing agreement reflected in the bail bond financing agreements against Plaintiffs or the Class;

g)     Enjoining Defendants to take corrective action with the Credit Bureaus removing any adverse reports based on invalid and unenforceable debts from the credit records of Plaintiffs and the proposed Class Members;

1   h)   Enjoining Defendants from continuing the challenged conduct;

2   i)   Awarding restitution to Plaintiffs and Class Members in an amount to be

3   determined at trial,

4   j)   Requiring disgorgement of all of Defendants' ill-gotten gains, not exceeding

5   Plaintiffs' and Class Members' out-of-pocket losses;

6   k)   Awarding actual damages to the Class for violations of the Rosenthal Act;

7   l)   Awarding statutory damages to the Class for violations of the Rosenthal Act;

8   m)   Awarding actual damages for violations of the Consumer Credit Reporting

9   Agencies Act;

10   n)   Awarding punitive damages for violations of the Consumer Credit Reporting

11   Agencies Act;

12   o)   Awarding reasonable attorneys' fees and expenses;

13   p)   Awarding pre- and post-judgment interest, to the extent allowable;

14   q)   Requiring injunctive and/or declaratory relief as necessary to protect the interests

15   of Plaintiffs and the Class; and

16   r)   Awarding such other and further relief as equity and justice require, including all

17   forms of relief provided for under the UCL.

18   **JURY DEMAND**

19   Plaintiffs request a trial by jury of all claims that can be so tried.

20   Respectfully Submitted,

21   **SARA MEDINA AND ALICIA MARTINEZ**,
individually and on behalf of all others similarly

22   situated,

23   Dated: March 10, 2023   By: */s/ Yaman Salahi*

24   Yaman Salahi

25   Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com

26   Todd Logan (SBN 305912)
tlogan@edelson.com

27   Yaman Salahi (SBN 288752)
ysalahi@edelson.com

28   EDELSON PC

150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

*Counsel for Plaintiffs Sara Medina, Alicia*
*Martinez, and the Proposed Class*